Good morning, Your Honors. May it please the Court. My name is Tom Woodbury. I'm here representing Native Ecosystems Council today. And this first case deals with the Gallatin National Forest. And I would like to begin with a little perspective as somebody from Montana. If you look at the very first page in the forest plan, which was established in 1987, the Gallatin National Forest is a national trust. I would go even further, Your Honors, and call it a national treasure because I know that's how the people of Montana feel towards it. The plan recognizes the significance of the greater Yellowstone area in which the Gallatin is situated and has been designated to complement the management of the entire greater Yellowstone ecosystem, according to the preamble to the plan. And the purpose of the plan was to ensure that the trust corpus would still be available for future generations, with special mention in the preamble of the elk herds the Gallatin is famous for. The Gallatin also includes calving grounds for our national mammal, the bison, which millions of people come to Yellowstone every year to view. So you can be assured, Your Honors, that the original Gallatin forest plan reflected the highest levels of public participation and concern with how wildlife habitat would be managed and that it represents an almost sacred pact between the government and the people over how this national trust would be preserved for future generations. Counsel, could we move to the particular project that's at issue here and what your particular objections are to the project? So let's begin today by considering the change in the Gallatin forest plan's old growth standard. Okay, so is it your position that NEPA applies in this case? Of course. The issues that I'll be addressing today and the issues that we're pressing on appeal are under the Forest Act and the NEPA triggered by the cleanup amendment to the forest plan. So could you explain how NEPA is triggered in the cleanup amendment? Is it extraordinary circumstances? The cleanup amendment is amendment to the forest plan standards that we'll be discussing today. And if those amendments are significant in relation to the original plan standards, then they have to supplement the environmental impact statement for the original forest plan. So the project that we have, the Smith-Shields project, is the first project implementing those revised standards. Just so procedurally I'm tracking what you're saying. This project stemmed from the Healthy Forest Restoration Act, correct? Yes. And there was a categorical exclusion that went along with that? Yes. And so you have to persuade us that despite the categorical exclusion, NEPA applies. Do you? And so we'll be getting into that particular issue more in the next case. In this case, it's not necessary to really delve into that issue because what we're challenging is the amendments to the forest plan. And there's no question that NEPA and the Forest Act apply to that. And the Farm Bill categorical exclusion requires that the project be consistent with the forest plan as well. Okay. So the Gallatin changed the old growth standard by substituting a 10 percent standard measured at the mountain range scale for the original 10 percent standard which was measured compartment by compartment. So what does that mean, to be measured at the mountain range scale? I'm afraid you're going to have to ask the Forest Service Counsel there, Your Honor. Well, what's your interpretation? You're bringing, you're saying that this change triggered the obligation to do further study. So what about that change in definition persuaded you that there's a difference? If we have to ask the Forest Service what it means, then we can't accept your argument that there was a meaningful change. So tell us what the change was and why it was meaningful. So the original standard required that the old growth be measured compartment by compartment in the suitable timber base. What does compartment by compartment mean? Timber, they're just administrative compartments in the suitable timber base when they go into log. So it's an area of analysis. So like unit by unit? It's like an analysis area for any timber harvest in the suitable timber base. Outside of the timber base, the suitable timber base, you'll have unsuitable forest or unsuitable for logging, meaning like wilderness, inventory, roadless areas that have been set aside. Logging compartment by logging compartment was the way it was before. So every time the Forest Service under the old plan would go into a proposed project like Smith Shields, they would say the timber compartment, they would look at the amount of old growth habitat in that compartment. And they would ensure that there would still be 10 percent old growth in the compartment after timber harvest, so they could log old growth down to 10 percent. Got it. Now, and they would provide maps, as they did in the previous litigation in the same area that the court had before in Hapner v. Tidwell. So the reason this is significant. Well, so the amendment does what? Changes it how? So the amendment says we're no longer going to analyze old growth in the timber compartment where we're logging. We're just going to tell you how much old growth there is at the mountain range scale. But we're not going to tell you. And when it says mountain range scale, is that a broad area, a broader area of the forest? So in this case, we're in the Crazy Mountains, which is a segment of the forest, like an island habitat apart from other parts of the National Forest. And so they say, well, we are going to look at the mountain range scale. Well, the entire Crazy Mountains. In other words, they're going to look at the mountains as a whole, as opposed to compartment by compartment. That's your complaint. Well, they're going to, when you say look at it, what they're actually saying is that we know that we're going to tell you that there's more than 10 percent, but we can't tell you where it is. All right. But I'm just trying to clarify in my mind what the range's perspective is and what the sites are, you know. So compartment to compartment as opposed to the entire mountain range. Right. And so under the original forest plan, which was based on best available science for ensuring old growth species viability, and decades of precedent from this court applying that in all different forests, what we know from the science and as applied by this court is that species viability is ensured or provided under the Forest Act by making sure there's enough habitat well distributed throughout the forest. Those are the two components that are very clear in science and law that to ensure species viability, you must have a minimum amount of habitat well distributed through the forest so that you don't end up with islands, stands of species that can't find each other for reproduction. If you don't have proper distribution, then species become individuals, reproductive individuals, become isolated and then the genetic diversity is compromised and that puts the species at risk. So this is pretty standard science and it's incorporated into all the original forest plans. So with the mountain range scale, if you ask the Forest Service, okay, you have the adequate amount of habitat in the Crazy Mountains, is it well distributed? They cannot answer that question. So what did they rely on in adopting their new standard? Did they just come out and pull it out of thin air and say, this is what we're going to do now? Or did they point to something or did they? There's a national database called the Forest Inventory Analysis, which is a grid placed over all of the forests. So in this case, in the Crazy Mountains, they're relying on 19 plots that are each a sixth of an acre in size. So they basically sampled a total of like seven acres. And this is a national database, which they extract and then they extrapolate to those 19 plots. They say are representative of this area of the forest. So they- And there's no basis for that? The Forest Inventory Analysis? Yeah, I mean, just what they ended up doing. The extrapolation. It's an extrapolation. Yes, but is your argument that there's no scientific basis for that? That that's clearly inconsistent with the overall purposes of the forest? Our argument is that this will tell you, this may tell you how much habitat there is, but it will not tell you where the habitat is located. And that's what's wrong with the amendment? That's part of what's wrong with the amendment. The second part of the amendment is that, as I said, the original amendment measured 10% in each timber base, so where they were logging, and said we're going to have a minimum 10% there, in addition to the old growth habitat that is not part of the suitable timber base in the forest, in wilderness areas, and in the crazy mountains, in an area like this, that when they say we don't know where the old growth is, it may be all outside of the inventory timber base. It may be all in wilderness and unroaded areas. So under the original plan, we know there was more than 10%, because the best old growth is going to be in wilderness areas and inventory rotus areas, so there's a buffer. There's a buffer from the 10% to whatever there is in the forest. We know under the science of the original forest plan that that's going to ensure viability for species. Now they're saying all we have to provide is 10%, and it doesn't matter where it is. So that 10% could be entirely within a wilderness area, and that would permit them to eliminate all the old growth everywhere in the suitable timber base. So how does that all relate? Well, never mind. We're not focusing so much on the project itself. We're challenging the revised standards. So basically we know that there's some amount that under the revised standard implemented without regard to the amount of old growth in each timber compartment. In this case, we don't know how much old growth there is in the timber compartment, because they haven't told us. And they don't have to tell us. And when you ask them for maps of the inventory, like where is the old growth, they say we can't tell you. Let me just make sure I understand this argument. So the argument focuses on the amendment to the forest plan. Is that correct? That is correct. And your argument is it doesn't match up to the Healthy Forest, what is it called? No, no, no. The Restoration Act? No, it doesn't measure up to the environmental impact statement and all the assumptions of the original forest plan. All right. So we go back to the, so now we're back into NEPA, into the EIS. There was an EIS here. There was not an EIS. That's what we're asking. Oh, I'm sorry. There was an EIS originally for the forest plan. And we're asking them to supplement the EIS for the forest plan in order to address these issues. And they're saying it's not a significant impact. Don't worry about it. We're not going to, we don't have to supplement the environmental impact statement for the forest plan, even though we're no longer following the science. Because there wasn't a significant change. Yes. We don't know how significant. Are you arguing that the amendment allows the Forest Service to destroy old growth forests? Sure, it does. It does? Yeah. They could eliminate all the old growth in a project area just by saying we know that there's old growth somewhere else. Yes. And what's your basis in the record for that? The basis in the record is that we asked how much old growth is in the project area, and they can't tell us. They say it doesn't matter. And we also know that they're logging. But the focus here is not. We also know that they are logging in previously designated old growth habitat. But the focus of your lawsuit in this case is on the amendment to the forest plan. Yes. Not this particular project. The project is under Ohio Forestry. We can only challenge an amendment to the forest plan when they're implementing it. They're implementing it through this project. This is the first project implemented. So what's the relief you're actually seeking in this case? That the environmental analysis for the amendments to the forest plan was arbitrary and capricious because it says that this is not a significant amendment to the forest plan. But you're actually asking for the project to be halted until there is a legitimate assessment? Is that what you're asking for? Yeah. This project is tiered to the amended standards. Right. And if the amended standards fall, then the project would have to be halted. That's true. Yes. How far along is the project? I'm sorry? How far along is the project? Well, I can't say. I know at the time that we asked for injunctive relief from the Court of Appeals, we were still trying to preserve previously designated old growth habitat, and I'm assuming that they probably logged that at this point. Is it moved? Is this case moved then? But even if the project is complete, these standards are going to continue to be implemented. That's what I meant. Your focus of your lawsuit really is at the amendment. Yes. Right. And the other issue that is significant, that we feel is significant, and the supervisor disagrees is with the elk habitat hiding cover standard and security. And they're saying now that they no longer have to provide two-thirds hiding cover for elk at the herd, you know, throughout the herd's range. The previous standard their biologist acknowledges was based on science that set based on a 15-year study before they adopted the forest plan that elk need two-thirds or good elk habitat is two-thirds hiding cover calculated on the basis of total area. That's not in dispute. Bad or poor habitat is when it's all the way down to one-third hiding cover based on total area of the herd. In the project we're challenging, it's 34%. And they're saying they could actually reduce it all the way down to 25% because under the revised standard, they're no longer calculating two-thirds hiding cover based on total area, even though the science and the environmental impact statement that is acknowledged in the environmental impact statement that the standard is based on, and even though the biologist agrees that it was based on that standard, says no, that's poor habitat. Time for a rebuttal. Yeah, I just want to make one last point on the elk security. They also didn't amend the security standard for elk, but they basically are stating hiding cover is no longer a component of elk security. So elk in hunting season hide in hiding cover, basically thick trees from the hunters, and when they don't have that, they leave. They basically, if the elk do not feel secure, they go to private ranches nearby out of reach of the hunters. So we have a situation here where the herd is three times the size of what Fish, Wildlife, and Parks wants it to be. They cannot control the population of the elk because they're leaving the forest before hunting season because they're not secure. And the Forest Service is saying that hiding cover doesn't matter for elk, that we don't have to include hiding cover in our calculation of security. And they say, in fact, the elk must be doing great because there's three times of elk population than what Fish, Wildlife, and Parks would like. And that is exactly the opposite of what the science and the facts and the records show, which is that the reason that the elk population is out of control is because there's not enough hiding cover. Why don't you save the 41 seconds left for a rebuttal? Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Tecla Hanson-Young, and I represent the Forest Service. The Smish Yields Project here is an important project because it is designed to treat approximately 1,600 acres of dead and dying trees in order to avoid catastrophic wildfire risks. The project was developed collaboratively with extensive public participation. It's located in an area that has been identified by local community wildfire protection plans as at severe risk of wildfire, and it has the support of the State of Montana. In what respect? I noticed that there was an amicus brief from the Department of Natural Resources of the State of Montana, but there was not one from the Department of Fish, Wildlife, and Parks. What's that all about? Did the Department of Fish, Wildlife, and Parks also agree with the project? Well, both departments participated extensively in the development of the project. I can't speak to why that department also didn't file an amicus brief, but in the amicus brief, it does talk about how the state as a whole supports the project. It's just curious to me that the Department of Fish, Wildlife, and Parks did not file a brief in support of the project. If you would like, I could contact the State of Montana. No, that's okay. It was just curious to me that it wasn't there. I can't speak to that, but the amicus brief itself does express its extensive support for the project. Right, but it's from the Department of Natural Resources as opposed to the State. On behalf of the state. And I think the support for the project is also expressed in the notes for the project itself, which are reproduced in the first volume of the supplemental excerpts of record that discuss how the local community participants were appreciative of the project and the treatments that it would provide. The focus here seems to be not so much on the project. In fact, the project may have been complete. Who knows? I don't know. The project actually isn't complete. It's underway. It's underway. That's correct. So his focus seems to be not so much on the project, but on the next level up. Right. Because he says the project is tiered to the amendments. Well, the project has to be consistent with the forest plan amendments. To qualify for the categorical exclusion under the Healthy Forest Restoration Act, it has to be consistent with the forest plan and the amendments. A simple way for this court to dispose of plaintiff's arguments relating to the forest plan and the project itself concerning old growth is to dismiss those arguments because the project itself doesn't affect any old growth in the forest. How do we know that, though? We know that because the Forest Service field surveyed all of the treatment units that it proposed to treat. And those surveys appear at SCR 225 to 368. And it excluded any of the units that had old growth. So old growth is classified by the Forest Service using certain qualifications that were developed in a study referred to as ‑‑ that the amendment classifies old growth differently than the forest plan did. The forest plan did it compartment by compartment, and the amendments allow a mountain scale. So which are you using when you say there is no old growth? The amendments. So the classification of old growth didn't change as a result of the amendments. It was simply the scale at which old growth would be assessed. But he says that is a change because it's different to say whether or not there is 10 percent old growth somewhere in the mountains as opposed to there is 10 percent old growth in each of these compartments that we are assessing. Well, regardless of where the old growth is located, as an initial matter, the Crazy Mountains, which is the mountain range that was According to a vegetation database that the Forest Service uses and the plotting system that Mr. Woodbury referred to. So it's already meeting and, in fact, exceeding the forest plan requirement to meet 10 percent old growth. But the difficulty I'm having with that argument is that we don't know if it's meeting the compartment by compartment. If you say the mountain as a whole has 10 percent, that's not the same as saying each compartment has 10 percent old growth. But what we know as a result of this project is that none of the treatment units will be harvesting any old growth. So even if the Forest Service had analyzed the percentage of old growth at the timber compartment level, there would still be no old growth affected by this project. There is simply no old growth that will be removed by this project. Did you make this argument to the district court? Yes, and the district court agreed. The district court rejected Mr. Woodbury's arguments that the project would impact old growth. But the district court seemed to go on and do the rest of the analysis as well, correct? That's correct. The district court did do that. You said one way to resolve this, an easy way to resolve this case is just to acknowledge that there's no That's correct, because the NEPA challenge that Mr. Woodbury raises is contingent on the fact that this project would have to, as he acknowledged himself, Ohio Forestry requires that the amendment be implicated and have a nexus to the project at issue. And here, if the project isn't impacting old growth, there can certainly be no significant environmental impacts resulting from removal of old growth that would require additional NEPA analysis. So your position is that even if we were looking at this through a compartment-by-compartment analysis for old growth, there would be no effect on old growth by this project? That's correct, because this project does not result in the removal of old growth, and that is well documented by the field surveys that the forest silviculturists conducted. He went out on the landscape and identified areas that would be treated and any old growth there, and the forest explicitly excluded any old growth from treatment. So what are we supposed to do then with the amendment? If the amendment allows a different calculation of old growth and it would make a difference, perhaps not with this project, but with the subsequent projects, how do we resolve that issue then? I have two responses to that. My first response would be the court would be better served by waiting until a new challenge to a different project is raised that actually implicates the amendment. My second answer is even if the court wants to dive into it now, it should find that the amendment itself didn't result or wouldn't result in any significant environmental impacts that would require additional NEPA analysis, because the change in the scale at which old growth is assessed doesn't result in significant environmental impacts, and let me explain why. A timber compartment is just a unit of forest that the forest uses to manage timber, so it would be typically much smaller than a mountain scale range. The old standard itself didn't require any geographic distribution of old growth. It did not require the forest to maintain old growth in a certain distribution. To get at this geographic distribution argument, the plaintiffs rely on language in the EIS for the forest plan, which referred to distribution being necessary to help maintain species viability. But if you look in the discussion in the EIS relating to timber and old growth, the EIS, and that's at SCR 647 and 48, the EIS makes clear that distribution doesn't refer to geographic distribution. It refers to successional stages in age class distribution, so saplings, middle-sized age trees, and then old growth. There's a variety of successional stages, but it's those successional stages that are important to maintain species viability. So why was the change made? The change was made because assessing old growth at the mountain range scale is more reliable. The forest has better data at the larger landscape level scale than at a timber compartment scale, and when you try to get down too narrowly to the timber compartment scale, the models are not as accurate. How long was the compartment-to-compartment scale used by the Forest Service? How many years? I don't know the answer to that. I can find out and submit that in a 20-minute... No, you don't have to find out. I was just asking because you said it's more accurate to do it at the mountain range, and I just wondered why it's just now being changed. If the other measuring device has been used for a number of years, what made it better now? Well, again, the two types of data the Forest Service relies on, which is a vegetation database that dates to 2015, and then the plotting method, which I believe has actually existed for a very long time. It's just found to be more accurate at a larger scale. There's two other reasons that the Forest gave for changing the scale from timber compartment to mountain range, and one is it actually makes more sense to assess old growth at a landscape scale because that is what matters more for species and assessing species viability. And then the other reason that the Forest Service gave in its environmental assessment for the amendment was that it would actually probably result in more old growth being retained than under the previous plan language, and the reason for that is if you think about the requirement that 10% of old growth be maintained only at a timber compartment level, that timber compartment is actually smaller, and the forest is only going to look at the timber compartment that's going to be treated by any given project, so all it has to do is maintain 10% in a smaller area. But if for every project the forest has to look at and maintain 10% across the entire landscape, that's going to ensure that more old growth is preserved across the entire landscape. But doesn't that presuppose that the species are dispersed randomly throughout the mountain as opposed to at particular habitat locations? Not necessarily. I mean, this reason that the Forest gave that there would likely lead to more old growth being preserved is simply a numerical look. If you're looking at a smaller level, you only have to concern yourself with what you're saving at the smaller level, but if you look at a bigger level, you have to ensure you're maintaining it across the whole landscape. And also species travel throughout the landscape. Some do, some don't. That's true. But the planists haven't alleged that any particular species here would be adversely affected by looking at the timber compartment level versus the mountain range level, and I don't think that they would have the scientific support to back that up. We'll ask when opposing counsel comes back, because I thought that was the whole point, that it would lead to less old growth, which would be less opportunity for the species to thrive. I thought that was the whole argument. I think what he was arguing with respect to the species viability related to this geographic distribution requirement, which, again, was never intended to be interpreted as the distribution language in the EIS, which was never intended to refer to geographic distribution, but was intended to refer to successional stages in age class diversity. Well, do I understand that the services categorically exclude the Smith Shields project, right? Yes, that's correct. And he's challenging your saying it's arbitrary and capricious for you to have done that? Yes. Well, one of his arguments is that it was the application of the categorical exclusion was arbitrary because the project doesn't maximize the retention of old growth. And your answer to that is what? It does maximize the retention of old growth because it doesn't actually remove any old growth. It can't possibly fail to comply with that standard if it doesn't remove any old growth whatsoever. And, again, he challenges the Forest Service's scientific determinations that no old growth would be impacted, but what he relies on is an extra record map, which the district court didn't consider, and also photographs in the record that do not demonstrate the existence of old growth but were used to show elk hiding cover and also are pictures of a stand that was excluded from treatment because if it was thinned, the remaining trees would be at risk of being blown down by high winds. So no evidence in the record undermines the field surveys that the Forest Service did, walking the ground and documenting old growth. I also would like to address Mr. Woodbury's argument that the forest plan amendment somehow changed the previous requirement because now it only applies to lands that are forested as opposed to lands that contain suitable timber. It's a language distinction without a difference. The previous plan language applied to lands that contained suitable timber, and now it applies to lands classified as forested. So it always only applied to lands that contained trees, and that is no change. And then I would also just like to say there's no requirement in NFMA, the Healthy Forest Restoration Act, or in NEPA that would require the agency to prepare maps of old growth and provide maps to the public and that's even more so in a case where the Forest Service has actually walked to the ground and looked at all of the units that will be treated to identify existing old growth and make sure that it will not be removed. What's your position on the elk hiding cover and security? The plaintiffs are incorrect when they argue that the plan amendment substantively changed the hiding cover requirement because their argument erroneously assumes that the old plan standard required the agency to maintain two-thirds of a total area as elk hiding cover. The language did no such thing. The language itself was confusing, and this court in Hapner found that the agency had been applying it incorrectly. The agency developed guidance that's referred to as the Canfield 2011 White Paper, and that's reproduced in full at SCR 549 to 570, which explained how the agency – it set forth guidance on how the agency should apply the standard going forward, which is to say that the forest has to ensure that two-thirds of the baseline amount of hiding cover is maintained at all times. And the baseline amount of hiding cover includes acreage that has been previously disturbed. So it includes acreage that has the potential to be hiding cover but was previously logged or was disturbed as a result of fire or whatnot. How did the forest plan read before amendment? The forest plan basically, it simply said, maintain two-thirds of hiding cover associated with key habitat components over time. And now the plan amendment says vegetation treatment shall maintain at least two-thirds of certain species – so it identifies certain tree species – on National Forest Service lands with at least 40% canopy cover to function as hiding cover for elk at any point in time. So it still requires that two-thirds of existing baseline cover be maintained. And we can see that the Forest Service applied the standard correctly here to this project by looking at the elk analysis unit, which is about 87,000 acres. It modeled the amount of hiding cover in the elk analysis unit and determined that there was about 30,000 acres of existing cover and about 300 acres of previously disturbed cover that wasn't existing but had the potential to be hiding cover. It combined those two figures and found that – so there would be – the baseline that it measured was about 30,300 acres. The project would result in the removal of 985 acres of hiding cover, which is well over two-thirds – which leaves well over two-thirds of the 30,000 baseline, which is measured against. So is that what it was measured against before amendment? Yes. It would have been measured in the same way before the amendment according to the Canfield 2011 white paper, which the Forest Service issued to address the Happner decision. Before the amendment, was previously disturbed land included in the count? After the Canfield white paper in 2011 and before the amendment, previously disturbed land was included. But prior to the Happner decision, which I believe was in 2010, the Forest Service, at least in that case, did not include previously disturbed cover as part of the baseline. So is it your position that the Happner case validated the inclusion of previously disturbed land in the calculation of hiding cover? Yes. And, in fact, it directed the agency to ensure that successive projects wouldn't whittle down the amount of hiding cover that would be available for elk. And there's no dispute here that in this project area, there's ample cover, hiding cover, and security areas for elk. The project, in fact, won't impact any elk security areas. And the best place that I could direct the court to look at is the collaborative report at ER 129 to 41 that discusses elk security areas and also the wildlife report at SER 434 to 447, which discuss how the project preserves both elk hiding cover and security areas by ensuring that roads are, for example, not open to the public during hunting season and that any temporary roads are close to existing roads. Could you point me to the language in Happner that you're relying upon to support the position that the Forest Service was directed to include previously disturbed areas in the determination of hiding cover? I don't have the case in front of me, but I believe it's at or around page 1251, so that would be 621 F. 3rd, 1251. And I think there's a language in there that says something about whittling away, so it would be in the paragraphs around that language where this court was concerned that the project at issue there wasn't taking into account the fact that previous project had resulted in the removal of elk cover and wanted to ensure that the agency was actually not going to successively whittle away the amount of elk cover over time. Yeah, but I didn't see where it talked about inclusion of previously disturbed landscape. I don't think it included that precise language, but the court was concerned with the issue that over time, if the agency didn't take into account previous projects, that it would result in a whittling down. Right, but that's a different thing than saying now we can amend the forest plan to include within our calculation for elk hiding cover previously disturbed land, parts of the forest. I think it addresses what the court was concerned about, which is that I think what the court was concerned about in Happner is that if the agency didn't consider what it had previously removed, what the elk cover it had previously removed, it would be allowed to, so say it would be allowed to comply with the forest plan as long as it kept two-thirds of whatever elk hiding cover was existing at the point in time that the project was taking place. All right, thanks. I don't see that in there, but you're entitled to your argument. Thank you, Your Honor. If the court has no further questions, I would ask the court to affirm the judgment of the district. Okay, I don't think so. All right. All right, counsel, I'll give you a minute here to respond. Okay, so quickly, when the Forest Service says they're not entering old-growth habitat, they're actually entering previously designated old-growth habitat. And if you look carefully at the record, at the arguments of why isn't that old-growth habitat anymore? Did it get younger? They basically said, well, we're no longer applying the lodgepole pine, which were the big old trees classification. We're changing the classification. And when you ask, well, why aren't you counting it as lodgepole pine old-growth habitat anymore? It was old-growth habitat in 2006. They say, well, there was a mountain pine beetle attack, and most of the lodgepole pine trees died. Okay, so then they point to the regional criteria, which only requires 10 to 12 living lodgepole pines per acre to be classified as old-growth and actually requires a high level or permits a high level of dead trees, because that's valuable to old-growth species. And they did not count the number of trees per acre. They can't tell you. They haven't even basically acknowledged why it was old-growth before and why it isn't now. But as far as applying their criteria, they didn't do the homework. They didn't tell us how many trees per acre there are for lodgepole pine so that it would no longer qualify as old-growth. And what's happening is classic succession of old-growth, which is the higher story of lodgepole pine, dies out. And then the doug fir comes up and takes over, and it becomes doug fir eventually. Well, they're saying, oh, the doug fir hasn't quite got there yet. We're not counting the lodgepole pine anymore, and the doug fir is not quite old enough yet, so therefore we can clear-cut it. Excuse me, but that is not old-growth species analysis. That's silvicultural analysis being used to basically justify logging what they previously had set aside as old-growth habitat. And that is just one example in the record of stands that were previously designated and disclosed as on maps as old-growth habitat, which now they're saying, oh, it's not old-growth habitat. Actually, they dropped one in response to that. So the reason why she can stand up here and say that there's no growth – they're not cutting any old-growth habitat in this particular project is because they've changed the classification? They've changed the classification without justifying it, without explaining why it no longer meets the criteria for old-growth that they used before to classify it as old-growth. I need to – we need to move on to the next case, so thank you. So this case is native – so the case we just heard, Native Ecosystems Council versus Erickson, is submitted on the – is submitted at this time, and we'll turn to the last case on the calendar, which is Native Ecosystems Council versus Leanne Martin.
judges: Gilman, Paez, Rawlinson